**UNITED STATES DISTRICT FOR**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

ROBERT COBASKY, JR. )
)
     Plaintiff, )
)
v. )   **No. 3:14-cv-01708**
)   **Chief Judge Crenshaw**
NANCY BERRYHILL[1], )
**Acting Commissioner of Social Security,** )
)
     Defendant. )

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is *pro se* Plaintiff Robert Cobasky, Jr.'s Motion for Judgment on the Administrative Record (Doc. No. 20), to which Defendant Commissioner of Social Security has filed a Response in Opposition. (Doc. No. 21). On August 22, 2014, this case was referred to the Magistrate Judge for, *inter alia*, a Report and Recommendation on disposition of the Complaint for judicial review of the Social Security Administration's decision. (Doc. No. 3). The Court hereby withdraws that referral. Upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 12)[2], and for the reasons set forth below, Plaintiff's Motion will be denied.

## I.    PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act in March 2011, alleging a disability onset of May 11, 2010. (A.R. 86-89). His claim

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.
[2] The Court will reference, hereinafter, the transcript of the administrative record by the abbreviation "A.R." The page number citations will refer to the page numbers as set out in the Court Transcript Index. That is, they will refer to the bold page number at the lower right corner of the page.

was denied both at the initial and reconsideration stages of state agency review. (A.R. 41-51). Plaintiff subsequently requested a review of his case by an ALJ (A.R. 55-56), who held a hearing on January 30, 2013 (A.R. 26-40). Among those present at the hearing were Plaintiff, his attorney, and an impartial vocational expert. (A.R. 26). On March 6, 2013, the ALJ issued an unfavorable notice of decision. (A.R. 8-22). That decision contains the following findings:

1. The [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The [Plaintiff] has not engaged in substantial gainful activity since May 11, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [Plaintiff] has the following severe combination of impairments: obesity, ischemic cardiomyopathy, congestive heart failure, obstructive sleep apnea, hypertension, non-insulin diabetes mellitus, and hyperlipidemia (20 CFR 404.1520(c)).

4. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, . . . the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can sit, stand, and walk for six hours in an eight-hour workday; with occasional ability to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; with an avoidance of concentrated exposure to temperature extremes and all pulmonary irritants; and with avoidance of all exposure to hazards, such as machinery and heights.

6. The [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).

7. The [Plaintiff] was 48 years old at the alleged onset date, which is defined as a younger individual. The [Plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).

11. The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from May 11, 2010, through the date of this decision (20 CFR 404.1520(g)).

(A.R. 13-22).

On June 20, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner of Social Security. (A.R. 1). Thereafter, Plaintiff timely filed this civil action (Doc. No. 1), and this Court has jurisdiction. 42 U.S.C. § 405(g).

## II.    REVIEW OF THE RECORD

In her decision, the ALJ presented a detailed recitation of the evidence in this case. (A.R. 14-21). Unless otherwise noted, the Court incorporates the ALJ's recitation of evidence and reproduces the majority of it below:

The claimant testified he was currently 51 years old, attended two years of college, drove, and used the computer only to check his emails. He was right-handed. He lived with his 15 year-old son and wife, who worked. He had last worked in May 2010. He preferred to work but did not think it was possible. When the issue of self-employment was raised, as referenced at exhibit 8F, the claimant had no explanation for this. He testified that his main disabling impairments were cardiomyopathy, congestive heart failure, stents, sleep apnea, and edema. He had pain in his hands and feet with the swelling, so it was hard to stand. He had a heart attack in 2007 and had always had shortness of breath since then. He quit smoking at that time. He testified that he was five feet, 10 inches tall, and weighed 306 pounds. He had gained about 70 pounds over the past couple of years. His doctor put him on a low calorie diet and he tried to ride a stationary bike, but it was too hard for him. He was complying with the diet. Regarding activities of daily living, he stated that he watched TV with his feet up if he was swelling and heated food in the microwave. He was unable [to] vacuum and do laundry because he could not lift heavy things. He testified that he drove half way to the hearing and his wife drove the rest of the distance. It took two hours and they stopped twice. The claimant testified that he could walk 25-55 feet at a time and sit in a straight chair 45-60 minutes at a time. When his legs swelled, he lied [sic] in bed or sat with his feet up for six to seven hours most days. He was not supposed to lift over 10 pounds

3

and said his doctor doesn't want him to work. The claimant further testified that one of his medications caused diarrhea and he used the bathroom three times an hour.

The claimant stated in the function report at exhibits 4E and 6E that throughout the day, he did the following: got his son off the school, ate breakfast, cleaned up a little, ate lunch, walked or rode a stationary bike, ate supper, watched television, and went to bed. He also fed the cats. He had no problems caring for his personal needs without reminders. He sometimes wrote notes to remind himself to take medication. He prepared simple meals daily; did laundry; mowed the lawn with a riding mower, but needed help trimming the yard because he could not use the weed eater. He went outside daily, walked and drove. He shopped in stores once a week for two to three hours, "normally." He read, went to the library, fished weekly, and socialized with others (family gatherings and cookouts). He sometimes attended church. He could no longer hunt.

The claimant alleged disability on May 11, 2010, due to congestive heart failure, cardiomyopathy, and obstructive sleep apnea.

The evidence established that the claimant had a history of bladder carcinoma, with cystoscopy and transluminal resection of the bladder in October 2004 and myocardial infarction with deployment of stents in March 2007, followed by the placement of an implantable cardioverter defibrillator in April 2007. However, he recovered, such that he was able to return to work and worked for a number of years, thereafter. A June 2009 cardiology note indicated that the claimant had cardiomyopathy with an ejection fraction of 25 percent, and ventricular tachycardia in 2008. However, he had done well from the standpoint of arrhythmia. Exhibits 1F and 2F.

Treating cardiologist, David A. Slosky, M.D., described the claimant as an individual with a history of ischemic cardiomyopathy, who was currently treated medically, in January 2010. Notes indicated that the claimant's only current complaint was of occasional lower extremity swelling. He denied chest pain, shortness of breath, dyspnea on exertion, palpitations, paroxysmal nocturnal dyspnea (PND), orthopnea, and consistent pedal edema, as well. He was noted as being compliant with medical therapy and tried to limit his salt intake. He also did not smoke. His medications consisted of Lisinopril, Zocor, aspirin, Lasix, nitroglycerin, Aldactone, and Plavix. The claimant was described as being in no acute distress. He weighed 278 pounds. His blood pressure was read as 120/80, while pulse was 80 and regular. Pertinent physical findings included the following: "jugular venous pressure to be less than 10 cm. of water. The apical impulse is not displaced. The first heart sound in [sic] normal. The second heart sound is normal. There is no S3. Central and peripheral pulses are intact. There is no clubbing, cyanosis or edema. Chest is clear to percussion and auscultation. Extremities are normal. Neurological exam is normal. HEENT is normal. Lymph nodes are

negative. Skin is negative. Abdominal exam reveals a markedly obese abdomen." Impression was that from a cardiac standpoint, the claimant was stable and currently euvolemic. However, the claimant did not appear to be able to lose weight. Therefore, Dr. Slosky recommended the claimant be evaluated at the surgical weight loss clinic for consideration of gastric banding or a new Sleeve procedure. Exhibits 2F and 4F.

The claimant underwent a urologic evaluation by Joseph A. Smith, M.D., in April 2010 for follow-up of his history of bladder cancer. Notes indicated that the claimant had not had any interval problems. Cystoscopic examination revealed mild trabeculation. However, the efflux was clear; and there were no tumors, stone, or areas of infection appreciated. Exhibit 2F.

In July 2010[3], Dr. Slosky stated that the claimant continued to do well; denying chest pain, shortness of breath, PND, and orthopnea. However, notes indicated that the claimant had recently seen Dr. Wathen and had complaints of swelling in the bilateral hands and lower extremities, particularly after a day of work. "The swelling would go away when he would not work since he was not standing in his feet and would resolve by the next day." Consequently, the claimant's Lasix was increased for two days, with improvement. However, "there was some return in the edema since reducing the Lasix back to its original dose, which was 40 mg." Regardless, it was interesting that notes indicated that the claimant was only mildly bothered by this on occasion. Additionally, he continued to live an active and healthy lifestyle (denying smoking and following a heart healthy diet). The claimant weighed 269 pounds, while his blood pressure was 130/62. The only difference in examination from the described in detail above was one-plus edema below the knees, bilaterally; with "good" peripheral perfusion, was appreciated. Dr. Slosky felt the claimant's edema was most likely hydrostatic, and did not represent a manifestation of worsening congestive heart failure (CHF). Since this was only a "minor annoyance," he recommended the claimant take a higher dose of Lasix for approximately two to three days, only if fluid buildup or increase in weight was noted. Exhibits 2F and 4F.

The claimant was hospitalized for two days in August 2010. At that time, he presented with complaints of low energy for approximately two to three months, associated with diarrhea and acute onset of fevers, which spiked during the day and responded to Tylenol. Aside from his acute symptoms, he also endorsed increasing dyspnea on exertion and PND, night sweats, one migraine, and loss of appetite. His blood pressure was 102/56; while his oxygenization [sic] level was 95 percent. There were scattered crackles as the base of the bilateral lung fields, otherwise air moved well. Heart rate was regular and with a 2/6 systolic murmur; pulse rate was 127. Trace pitting edema was noted in the bilateral lower limbs. Laboratory testing

---

[3] It appears that the correct date associated with the observations of Dr. Slosky as set forth in this paragraph is actually July 30, 2009. (A.R. 224).

was notable for leukopenia and thrombocyctopnia [sic]. Chest x-ray revealed a possible tine [sic] retrocardiac opiacity [sic], felt to be vasculature in nature, but was described as being without acute infiltrate. The clinical picture that emerged was most consistent with Ehrlichiosis or other tick-borne disease. The claimant defervesced on Doxycycline and was released. Exhibit 2F.

The claimant returned to Dr. Slosky, approximately three weeks after the above-described short hospital stay. Notes indicated that the claimant was still somewhat fatigued and short of breath on exertion. He had had no further episodes of diarrhea, but said he [sic] wife would detect a mild fever (in the 99 range) at night. He denied PND and orthopnea. The claimant's blood pressure was 138/74. Examination was only significant for "one-plus edema." Notes also indicated that the claimant did not feel like he was able to perform his job, although he was able to perform other activities of daily living. Dr. Slosky again stated the claimant was stable from a cardiac standpoint. However, he added that it did not appear that the claimant could perform his job duties as they required heavy lifting and standing 10 to 12 hours a day. Dr. Slosky stated that he would support the claimant's request for a potential job change or inability to work at that time. Exhibits 2F and 4F.

The claimant was also scheduled for a check of his defibrillator with Dawood Darbar, M.D., that same day. Notes indicated that the claimant had not been followed at the Arrhythmia clinic since implantation (2007) and that he returned because he had an ICD shock in May 2010. Notes also indicated that the claimant was operating a chain saw when this shock occurred. The device only fired once and he had not experienced any preceding dizziness, lightheadedness, or presyncope or syncope. The device fired only once and since then, he had experience [sic] no further shocks. The claimant currently described symptoms of progressive heart failure with progressive tiredness and fatigue, dyspnea with walking less than one block, two-pillow orthopnea, PND, and ankle swelling. He denied any chest pain. Notes stated that he had quit smoking in 2007, and had gained 40 pounds since then. Device interrogation revealed that all testing and measurements were within normal limits. However, the claimant did receive a "30J" shock for sinus tachycardia. Dr. Darber [sic] recommended re-initiating a beta-blocker to reduce the risk of additional inappropriate ICD shocks and progressive heart failure symptoms. It was noted that the beta-blockers had resulted in diarrhea in the past; however, the claimant agreed to take this medication again. An EKG revealed sinus tachycardia and multiple ventricular premature complexes. Exhibits 1F-2F, 4F and 7F.

The claimant had complaints of exertional shortness of breath, fatigue, and chronic edema when he returned to Dr. Slosky in September 2010. However, he was described as being in no acute distress. He denied orthopnea and PND. Notes indicated that he had worked for the last three years, but had become unable to continue this. His blood pressure was 128/68. The only positive clinical finding,

per examination was two-plus edema below the knees, bilaterally. Even though the claimant's cardiovascular status was deemed stable, Dr. Slosky stated that the claimant was not able to perform his work activities and was totally disabled. The claimant was advised to consult a dietitian and encouraged to exercise as much as possible. Exhibits 1F and 4F.

The claimant also received primary care from [and] returned to Bharat Patel, M.D. The claimant presented for a "routine follow-up" appointment in November 2010. Notes indicated that he presented with hypercholesterolemia. However, he denied experiencing any related symptoms of such. Notes also stated that his compliance with treatment had been poor. He did not follow a diet and exercise program. The claimant also did not keep a blood pressure diary; however, he reported typical readings of "systolics in the 130s to 140s and diastolics in the 80s." He was described as having NYHA class III, regarding congestive heart failure (CHF), the course of which was described as stable. The claimant reported he had an ejection fraction of 20-30 percent, per transthoracic echocardiogram. Notes also indicated that the claimant could walk 10-15 yards before having to stop and rest and that he tried to follow a low-salt diet. The claimant "mentioned" that he was snoring and that his wife had noticed apneas. He had reportedly gained more than 80 pounds in the last two years and was very tired. [Exhibit 1F].

Nevertheless, review of symptoms was negative for all of the following: fatigue, chest pain, palpitations, dizziness, orthopnea, recent dyspnea, nausea, abdominal pain, headaches, paresthesias and weakness. He did, however, report back pain. The claimant was described as well-nourished, well-developed, well-groomed, and in no apparent distress; yet morbidly obese. His blood pressure was read as 108/66. Upon examination, respirations were with a normal respiratory rate and pattern; while heart rate was regular and rhythmic, free of any gallop, rub, click, or edema. Range of motion of the cervical spine was "normal." Carotid examination was also "normal" with good upstroke and no bruit. The claimant ambulated with a normal gait. He was advised to exercise, lose weight, elevate the head of the bed, and follow a reduced carbohydrate diet. He was to continue with his current medication regime, including Plavix, Furosemide, Simvastin, Lisinopril, and Coreg CR. A polysomnogram in December 2010 revealed a "very severe obstructive sleep apnea disorder," treated with CPAP titration. It was interesting that the claimant's occupation was noted as "Employed at Trane (Self-Employed)." Exhibit IF.

Dr. Slosky stated that the claimant was doing quite well from a cardiac standpoint in February 2011. The claimant denied chest discomfort, shortness, palpitations, PND and orthopnea. He did have, however, chronic lower extremity edema. It was then noted that the claimant had "moderate, chronic" shortness of breath, which was improved after his recent diagnosis of OSA and treatment with CPAP titration. The claimant was having some difficulty adjusting to the mask, finding the mask out of place on many occasions, upon waking. Notes further indicated that the

claimant was "working with a personal trainer and attempting to loose [sic] weight and reconditioning." His blood pressure was 122/72. Examination, this time revealed a physiologically [sic] split second heart sound and . . . what [is] called, chronic edema below the bilateral knees. Dr. Slosky continued to emphasize weight loss and exercise, with a continuation of his program of reconditioning. Exhibit 2F.

The claimant returned to Dr. Patel in August 2011 for laboratory results, specifically A1c. Notes indicated that the claimant had been very complaint [sic] with diet and his blood glucose levels had remained stable. However, he had not lost any weight. The claimant also had no complaints. Notes were contradictory, however, as they also stated that regarding hypercholesterolemia, compliance with treatment had been poor, as he did not follow a diet and exercise program. It was again noted that he was self-employed at Trane. He was currently smoking two packs of cigarettes a day. A1c level was 5.6. Impression was of non-insulin dependent diabetes mellitus. Aggressive weight loss with regular exercise (mainly aerobic), low calorie diet, and smoking cessation were advised. Exhibit 8F.

December 2011 notes from Dr. Patel also indicated that the claimant was not following diet and exercise program for hypercholesterolemia; while being very compliant with diet, regarding hyperglycemia. Regardless, he had no complaints concerning either condition. The claimant weighed 310 pounds. His blood pressure was read as 116/64. Examination remained without positive clinical finding[4]. The claimant was deemed stable. Notes continued to state the claimant was self-employed at Trane at this time, and also on a health summary of the claimant in December 2012. Exhibit 8F.

The claimant presented to Dr. Darbar for a follow-up evaluation in June 2012. Notes indicated that he had felt generally well, but related persistent ankle swelling, and shortness of breath when climbing one to two flights of stairs. However, he denied experiencing multiple symptoms, including the following: any chest pain, dizziness, presyncope, syncope, PND, orthopnea, claudication, headache, polydipsia, polyuria, diarrhea, nausea, extremity/joint pain, and sleep apnea. The claimant was described as being in no apparent distress. He weighed 317.3 pounds. His blood pressure was 118/72. Examination did reveal one-plus edema of the bilateral lower extremities; otherwise, it was essentially normal. Expiratory phase of the lungs was normal; without rales, rhonchi, or wheeze. Heart rate was with normal S1 and S2; absent S3, S4, murmur, and click. There was no carotid bruit or hepatojugular reflux; while jugular venous distension and pressure were both normal. The abdomen was free of any tenderness or mass. Notes indicated that the claimant had not experienced any episodes of VT/VF since September 2011; and

---

[4] Even though Dr. Patel's notes indicate that Plaintiff was well developed, well nourished, well groomed, and had no apparent distress, they also indicate that he was morbidly obese and was positive for back pain. (A.R. 384-385).

that all testing and measurements were "within normal limits," per current device interrogation. EKG showed sinus tachycardia with occasion PVCs; "probable anterior infarct, old." Dr. Darbar noted that earlier that same day, Dr. Slosky had increased the claimant's dose of Furosemide to alleviate some of the claimant's increased lower extremity swelling (Of note, this office visit could not be found in the records). However, Dr. Dabar [sic] also found the claimant's ischemic cardiomyopathy to be stable with no recent exacerbations.[5] Exhibit 7F.

Dr. Slosky completed a questionnaire of the claimant in October 2011, stating that he had last examined the claimant in February 2011. He indicated that the claimant had marked limitations in physical activity due to fatigue, dyspnea, or angina [sic] discomfort with even ordinary exertion; and was symptomatic even at rest. He estimated that the claimant would be absent from work more than three times per month; and that the claimant's experience of chest pain, fatigue or shortness of breath would frequently interfere with attention and concentration. However, he did not describe any work-related restrictions that he had placed upon the claimant. Exhibit 6F.

(A.R. 14-19).

## III.    ANALYSIS

### A.  Standard of Review

"The Commissioner determines whether a claimant is disabled and entitled to benefits, 42 U.S.C. § 405(h), and [this Court's] review of this decision 'is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards[.]'" Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014) (quoting Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence lies between a preponderance and a scintilla; it refers to relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" Gibbens v. Comm'r of Soc. Sec., 659 F. App'x 238, 243 (6th Cir. 2016) (quoting Rogers, 486 F.3d at 241). The Commissioner's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (citing Smith v. Sec'y of Health &

---

[5] Dr. Darbar also noted that Plaintiff had symptoms of progressive heart failure. (A.R. 379).

Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)).  However, in determining the substantiality of the evidence, a court must examine the record as a whole, taking into consideration "'whatever in the record fairly detracts from its weight.'"  Id. (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)).

This Court may not "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'"  Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)).  "Where, however, an ALJ fails to follow agency rules and regulations, [the Court will] find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'"  Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016) (quoting Gentry, 741 F.3d at 722).

## B. Administrative Proceedings – the Five-Step Inquiry

A disability is defined by the Social Security Act ("the Act") as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "To determine if a claimant is disabled within the meaning of the Act, the ALJ must follow a five-step analysis, as set forth in 20 C.F.R. § 404.1520."  Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011).  Pursuant to that five-step sequential evaluation process:

(1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings;
(2) a claimant who does not have a severe impairment will not be found to be disabled;
(3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four;

(4) a claimant who can perform work that he has done in the past will not be found to be disabled; and

(5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Id. (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)).  Throughout the first four steps of the analysis, the claimant bears the burden of proof.  Id. at 863 (citing Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).  However, at the fifth step, "the burden shifts to the Commissioner to identify 'a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.'"  Id. (quoting Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003)).

### C. Plaintiff's Claims of Error

Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely credible."  (A.R. 19).  In his motion, Plaintiff contends that his company deemed him disabled from performing any type of work at his former job, that he has never been seen by a doctor from the Social Security Administration (SSA), and that the SSA "need[s] to start going by the patient[']s doctor."  (Doc. No. 20 at 1).  Additionally, Plaintiff submits letters from Ingersoll Rand regarding his approved application for disability pension from the Trane Merged Hourly Pension Plan ("Ingersoll Rand letters").  (Id. at 3-5).

"Because Plaintiff is proceeding *pro se*, [his] filings and arguments are liberally construed in [his] favor."  McNier v. Comm'r of Soc. Sec., 166 F. Supp. 3d 904, 908 (S.D. Ohio 2016) (citing Franklin v. Rose, 765 F.2d 82, 84–85 (6th Cir. 1985) (giving a liberal construction to a *pro se* habeas petition)).  As such, the Court considers *pro se* Plaintiff's submission of the Ingersoll

Rand letters to be a request for a Sentence Six remand under 42 U.S.C. § 405(g). See McNier, 166 F. Supp. 3d at 910 (citing Martin v. Comm'r of Soc. Sec., No. 3:13-cv-1166, 2014 WL 2114690, at *3 (N.D. Ohio May 20, 2014)). Furthermore, the Court construes Plaintiff's motion to argue that the ALJ's findings were not supported by substantial evidence. The Court will address these matters in turn.

**1) Sentence Six Remand**

"Sentence six of 42 U.S.C. § 405(g) enables a district court to remand a disability case for further administrative proceedings in light of evidence presented after the ALJ's decision." Lee v. Comm'r of Soc. Sec., 529 F. App'x 706, 717 (6th Cir. 2013). Here, the ALJ issued her decision on March 6, 2013. However, the Ingersoll Rand letters that Plaintiff submits regarding his application for disability pension from the Trane Merged Hourly Pension Plan are dated January 2, 2014, and March 3, 2014. (Doc. No. 20 at 3-5). Therefore, the ALJ did not have the opportunity to consider them.

"To obtain a sentence-six remand, a claimant has the burden to establish that there is (1) new evidence; (2) which is material; and (3) that there is good cause for the failure to submit it to the ALJ." Lee, 529 F. App'x at 717 (citing Bass, 499 F.3d at 513). The Court views newly submitted evidence "only to determine whether it meets the requirements for sentence-six remand[,]" and does not consider it when reviewing an ALJ's decision for substantial evidence. Id. (citing Foster v. Halter, 279 F.3d 348, 357 (6th Cir. 2001)). "[E]vidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" Foster, 279 F.3d at 357 (citation omitted). "[E]vidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" Id. (citation omitted). Finally, "[a] claimant shows 'good cause' by

demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." Id. (citation omitted).

Here, even assuming that the Ingersoll Rand letters are new evidence and good cause exists for failure to submit them, Plaintiff has not established that the letters are material. In one of the Ingersoll Rand letters, the Global Benefits Analyst states the following in regards to Plaintiff:

> Based on the information provided by your physician(s) about your condition, your inability to perform the duties of any occupation within the company, and the expectation that there will be no improvement, I have determined that you meet the criteria for disability pension.

(Doc. No. 20 at 3). In her decision, the ALJ considered Dr. Slosky's opinions that Plaintiff could not perform his work duties and was totally disabled. (A.R. 20). Even though the ALJ ultimately found that Plaintiff was not disabled within the meaning of the Act, she concluded that Plaintiff was unable to perform any past relevant work. (A.R. 21-22). Because the latter appears to be the basis for Plaintiff's approved application for disability pension, Plaintiff has not shown "a reasonable probability that the Secretary would have reached a different disposition of the disability claim" had she been presented with the Ingersoll Rand letters.

Additionally, that Plaintiff was found to have met the criteria for disability pension does not bind the SSA because "[t]he Code of Federal Regulations . . . provides that disability decisions by other governmental agencies and non-governmental agencies are not determinative of a claim for Social Security disability benefits." Brooks v. Boilermakers-Blacksmith Union Nat'l Pension Trust, No. 3:15-1034, 2017 WL 413800, at *8, n.9 (M.D. Tenn. Jan. 30, 2017) (citing 20 C.F.R. § 404.1504), report and recommendation adopted, No. 3:15-1034, 2017 WL 660679 (M.D. Tenn. Feb. 17, 2017). Even though one of the Ingersoll Rand letters states that Plaintiff lacks the ability to perform any occupation within his former company, it obviously does not consider Plaintiff's ability to perform jobs outside his former company. However, in order to find a claimant disabled

within the meaning of the Act, the SSA must determine that no job exists in significant numbers in the national economy that the claimant can perform if it finds that claimant is unable to perform any past relevant work. For that reason, the Ingersoll Rand letters approving Plaintiff's application for disability pension are not determinative of Plaintiff's claim for Social Security benefits. See Marchlewicz-Debats v. Shalala, 23 F.3d 407 (Table), 1994 WL 109002, at *9 (6th Cir. 1994) (stating that "there is no indication that the disability criteria for the [pension plan,]" which were met by the treating physician's opinion that claimant was totally and permanently disabled for any position at her job, "is the same as the criteria for receipt of Social Security disability benefits.").

To the extent Plaintiff's submission of the Ingersoll Rand letters was an implicit request for a Sentence Six remand under 42 U.S.C. § 405(g), it is denied.

### 2) Substantial Evidence Supports the ALJ's Findings

#### i.    <u>Plaintiff's Credibility</u>

"[S]ubjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." Cruse, 502 F.3d at 542 (internal quotation marks and citations omitted). Where objective medical evidence establishes a medical impairment that could reasonably be expected to produce the alleged disabling symptoms, the intensity and persistence of those symptoms are evaluated to determine the limitations they place on the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).[6] "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a

---

[6] Effective March 16, 2016, SSR 16-3p superseded SSR 96-7p. See SSR 16-3p, 2016 WL 1119029 (S.S.A. March 16, 2016). As the ALJ's findings and conclusions were made prior to March 16, 2016, the Court applies SSR 96-7p. See Cameron v. Colvin, No. 1:15-CV-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016) (explaining that SSR 16-3p is not applied retroactively).

determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'" Rogers, 486 F.3d at 247. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." Id. at 248. Additionally,

> [r]elevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.

Id. at 247 (citing 20 C.F.R. § 416.929 and SSR 96-7p, 1996 WL at *2-3). Where an ALJ's credibility determinations are supported by substantial evidence, reviewing courts give their decisions great weight. Cruse, 502 F.3d at 542 (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).

In this case, the ALJ analyzed Plaintiff's complaints of allegedly disabling symptoms and found Plaintiff's testimony not entirely credible. The Court finds that the ALJ's analysis complies with 20 C.F.R. § 404.1529(c) and SSR 96-7p and is supported by substantial evidence.

Even though the ALJ found that Plaintiff's cardiac condition is limiting, she found Plaintiff not credible with respect to the alleged severity of his impairments because of inconsistencies in his testimony and evidence in the record. (A.R. 19). For example, the ALJ noted that, at the hearing, Plaintiff testified that he had experienced shortness of breath since his heart attack in 2007. (A.R. 19, 32). However, Plaintiff denied having shortness of breath, in addition to chest pain, palpitations, PND, and orthopnea at January 2010 and July 2009[7] visits with Dr. Slosky.

---

[7] The Court notes that the ALJ incorrectly stated that this particular visit occurred in July 2010, as opposed to July 2009. However, the ALJ's inadvertence does not detract from her conclusion that Plaintiff provided

(A.R. 19, 223, 224). Furthermore, the ALJ noted that Plaintiff's complaints of dyspnea (shortness of breath) and other symptoms during his hospitalization in August 2010 were consistent with symptoms of a tick-borne disease, as opposed to stemming from Plaintiff's cardiac problems. (A.R. 19, 221).

The ALJ noted that a medical record from February 2011 indicated that Plaintiff's moderate chronic shortness of breath had improved with CPAP titration. (A.R. 19, 206). The February 2011 record indicated that Plaintiff denied shortness of breath at that visit and was "doing quite well" from a cardiac standpoint. (A.R. 206). And as late as June 2012, Dr. Darbar, another heart physician, noted that Plaintiff's ischemic cardiomyopathy was stable without any recent exacerbations. (A.R. 20, 380). Furthermore, the ALJ considered that even though Plaintiff testified at the hearing that his sleep apnea is an impairment that prevents him from working and testing in 2010 revealed that Plaintiff had severe obstructive sleep apnea, Dr. Darbar stated that Plaintiff had no sleep apnea in June 2012. (A.R. 20, 168, 378). This evidence supports a finding that Plaintiff was not as limited as he claimed.

The ALJ also permissibly considered Plaintiff's daily activities in evaluating his subjective complaints. See Temples v. Comm'r of Soc. Sec., 515 F. App'x 460, 462 (6th Cir. 2013) ("Further,

---

inconsistent testimony with respect to his experience with shortness of breath. This is especially so because Dr. Slosky noted, at a February 2011 visit, that Plaintiff was doing "quite well" from a cardiac standpoint, and that Plaintiff denied shortness of breath, chest discomfort, palpitations, PND, or orthopnea. (A.R. 206). However, because of the ALJ's mistake in citing the correct year, the Court disregards her following analysis:

> "It was also telling that in July 2010, notes indicated that the claimant had complaints of swelling in the bilateral hands and lower limbs, particularly after a day or work; since this was approximately two months after the alleged onset date. Regardless, the claimant admitted that edema was only a 'minor annoyance.' Dr. Slosky also felt the claimant's symptoms were hydrostatic and did not represent a worsening of [congestive heart failure] (Exs. 2F and 4F)."

(A.R. 19-20). Nevertheless, even disregarding the aforementioned portion of the ALJ's analysis, substantial evidence still supports the ALJ's credibility determination.

the ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible.").  The ALJ determined that Plaintiff's testimony at the hearing about his activities conflicted with Plaintiff's own statements in his function reports.  (A.R. 20).  Plaintiff testified that on a typical day he would "straighten up something," or, if not, just watch television while elevating his feet.  (A.R. 34).  Although he testified he is able to microwave food for himself, he denied being able to do laundry or vacuum the house.  (A.R. 34).  However, in Plaintiff's function reports, he stated, and the ALJ noted, that he did all of the following things: got his son off to school, cleaned up a little, walked or rode a stationary bike, cut grass with a riding mower, shopped once a week for about two hours, went to the library and fished weekly, and did laundry for three hours three times a week.  (A.R. 119-121, 132-133, 135).  Therefore, Plaintiff's function reports support the finding that Plaintiff was not as limited as he testified.

Furthermore, the ALJ may and did use Plaintiff's non-compliance with treatment as a factor when determining credibility.  See Ranellucci v. Astrue, No. 3:11-CV-00640, 2012 WL 4484922, at *9 (M.D. Tenn. Sept. 27, 2012) ("[Evidence that Plaintiff's condition significantly improved with treatment], in addition to Plaintiff's history of general non-compliance with treatment, as evidenced in the record, gave ALJ Roberts substantial evidence to find Plaintiff's testimony regarding the severity of her symptoms not credible.").  The ALJ noted that the "constant theme throughout [the] evidence was that the claimant needed to follow a low fat diet, exercise, and aggressively lose weight."  (A.R. 20).  However, medical notes from February, May, and December 2011 signed by Plaintiff's primary care doctor, Dr. Patel, document Plaintiff's non-

compliance with a diet and exercise regime, at least with respect to controlling his hypercholesterolemia.[8] (A.R. 327, 323, 384).

In light of the foregoing, the Court finds that the ALJ relied on substantial evidence in determining the credibility of Plaintiff's subjective complaints regarding the severity of his symptoms.[9]

### ii.     Weight Given to Opinions of the Treating Physician and State Agency Doctors

In his motion, Plaintiff argued that he had "never been seen by a doctor from the Social Security Administration" and that the SSA "need[s] to start going by the patient[']s doctor." (Doc. No. 20 at 1). Therefore, the Court construes Plaintiff's argument to be assigning error to the weight the ALJ gave to the opinion of Dr. Slosky as Plaintiff's treating physician and the opinions of Dr. Charles Settle and Dr. Thomas Thrush as state agency physicians.

The ALJ must consider every medical opinion submitted by the claimant. 20 C.F.R. § 404.1527(c). However, "not all medical sources need be treated equally, classifying acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources." Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007)

> A nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case. A nontreating source (but examining source) has examined the claimant

---

[8] The Court notes, as the ALJ did, that Dr. Patel's notes seem inconsistent in that he also indicates that, as it relates to hyperglycemia, Plaintiff was very compliant with his diet, avoiding carbohydrates. (A.R. 20, 384). However, with respect to both hypercholesterolemia and hyperglycemia, Plaintiff was noted as not having complaints. (A.R. 384).

[9] The Court acknowledges that Plaintiff's medical records document that Plaintiff had progressive heart failure and a restrictive American Heart Association and New York Heart Association functional ability rating. (A.R. 379). Although that evidence may support a conclusion contrary to the one the ALJ reached, "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts[,]" and "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009) (internal quotation marks and citations omitted).

but does not have, or did not have, an ongoing treatment relationship with her. A treating source, accorded the most deference by the SSA, has not only examined the claimant but also has an ongoing treatment relationship with her consistent with accepted medical practice.

Id. (internal quotation marks and citations omitted) (alterations in original). An opinion submitted from a treating source generally is given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's record. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL 374188, at *1 (S.S.A. July 2, 1996). If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must weigh the opinion in accordance with the following factors and give "good reasons" for the weight given: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; how well the opinion is supported; whether the opinion is consistent with the record as a whole; whether the source is specialized; and any other relevant factors. 20 C.F.R. § 404.1527(c); see also SSR 96-2p, 1996 WL 374188, at *4-5. These "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Rogers, 486 F.3d at 242 (internal quotations omitted) (quoting SSR 96-2p, 1996 WL 374188, at *5).

The ALJ gave Dr. Slosky's opinion little weight because of inconsistencies in the doctor's own opinion, the fact that disability determinations lie with the Commissioner, and because Dr. Slosky had not recently treated Plaintiff. In August 2010, Dr. Slosky examined Plaintiff and wrote, "The patient is stable from a cardiac standpoint, but it does not appear that he is able to perform his work at this time since it requires standing on his feet for 10 to 12 hours a day and heavy lifting." (A.R. 212). Dr. Slosky continued, "I will support his request for a potential job change or inability to work at this time." (A.R. 212). After a September 2010 follow-up visit, Dr. Slosky

indicated, "The patient's cardiovascular status is stable, although he is not able to perform his working activities and is totally disabled." (A.R. 207). Then, in October 2011, Dr. Slosky indicated the following about Plaintiff: he had marked limitations of physical activity; had symptoms triggered, in part, by stress; was symptomatic even at rest; would likely be absent from work more than three times per month; and would frequently experience chest pain, fatigue, and shortness of breath sufficiently severe to interfere with attention and concentration. (A.R. 361-362). However, Dr. Slosky did not identify any work-related restrictions. (A.R. 362).

The Court finds that the ALJ provided good reasons for giving little weight to Dr. Slosky's opinion, and substantial evidence supports the ALJ's decision. First, as the ALJ noted, Dr. Slosky initially opined that Plaintiff was unable to work his former job. However, Dr. Slosky later stated that he would support Plaintiff's request for either a job change or inability to work. Therefore, as the ALJ noted, Dr. Slosky suggested Plaintiff could perform work other than the work he had been performing. It was inconsistent for Dr. Slosky to state that he would support Plaintiff's request for inability to work in light of Dr. Slosky's opinion that Plaintiff simply could not perform work requiring heavy lifting or standing 10 to 12 hours a day. And the ALJ considered Dr. Slosky's opinion to the extent that she determined that Plaintiff has the residual functional capacity to perform light work and can stand for up to six hours in an eight-hour workday.

Second, it was not error for the ALJ to assign little weight to Dr. Slosky's opinion that Plaintiff was totally disabled because disability determinations are within the domain of the Commissioner of Social Security. See Curler v. Comm'r of Soc. Sec., 561 F. App'x 464, 472 (6th Cir. 2014) ("[D]isability determinations are the prerogative of the Commissioner.") (citing Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985)). Therefore, the ALJ appropriately did not give

special significance to Dr. Slosky's statement that Plaintiff was disabled.  See 20 C.F.R. § 416.927(d)(3).

Finally, the ALJ permissibly discounted Dr. Slosky's October 2011 opinion.  As the ALJ noted, Dr. Slosky offered his opinion regarding Plaintiff's limitations and their effects on Plaintiff's expected work attendance, attention and concentration in October 2011 although Dr. Slosky had last examined Plaintiff more than half a year earlier in February 2011.  (A.R. 20, 361).  And in the February 2011 examination, Dr. Slosky noted that Plaintiff was doing "quite well" from a cardiac standpoint and that Plaintiff denied chest discomfort, shortness of breath, palpitations, PND, or orthopnea.  (A.R. 206).  Therefore, evidence in the record is at odds with Dr. Slosky's October 2011 assessment, and it was proper for the ALJ to give Dr. Slosky's opinion little weight.  See Sullivan v. Comm'r of Soc. Sec., 595 F. App'x 502, 507 (6th Cir. 2014) ("This court has previously held that it is proper for an ALJ to give a treating physician's opinion less-than-controlling weight where a claimant is 'unable to direct this court to any portion of the [treating physician's] records which support' the treating physician's ultimate opinion.") (alteration in the original and citation omitted).

The ALJ also properly considered and weighed the opinions of the state agency non-examining doctors.  (A.R. 20-21, 287-295, 360).  See Gustafson v. Comm'r of Soc. Sec., 550 F. App'x 288, 289 (6th Cir. 2014) ("[T]he ALJ's finding was supported by the opinions of two reviewing psychologists, who concluded that Gustafson did not meet the regulatory listing for mental retardation."); see also SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996) ("Findings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources . . . .").  The ALJ gave significant weight to their opinions when determining

Plaintiff's residual functional capacity because "they [were] consistent with the evidence when viewed in its entirety." (A.R. 21). As part of their assessment, the state doctors noted that the record indicated that Plaintiff's conditions were stable, Plaintiff had not always been compliant with his diet and exercise regime, and that Plaintiff led a relatively active lifestyle given his conditions. (A.R. 292, 360). Because the Court agrees that the state agency non-examining doctors' opinions were consistent with evidence in the record, it was not error for the ALJ to give them significant weight.

### iii.     <u>The ALJ's Hypothetical Question</u>

Finally, the vocational expert's response to the ALJ's hypothetical question constitutes substantial evidence for finding Plaintiff not disabled. See <u>Gant v. Comm'r of Soc. Sec.</u>, 372 F. App'x 582, 585 (6th Cir. 2010) (citing <u>Varley v. Secretary of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987) (stating that substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical if the question accurately portrays the plaintiff's individual physical and mental impairments)). In response to the ALJ's first hypothetical question incorporating the limitations identified by the state agency non-examining doctors, the vocational expert testified that there were jobs that Plaintiff could perform, such as an assembler of small products, a price tagger, and a cashier. (A.R. 37-38). However, in response to the ALJ's second hypothetical question incorporating the limitations identified by Dr. Slosky, the vocational expert testified that there would be no work in the local or national economy that Plaintiff could perform. (A.R. 38-39). The ALJ ultimately relied on the vocational expert's response to her first hypothetical question. (A.R. 21-22).

As discussed above, the ALJ gave proper weight to the opinions of Plaintiff's treating physician and the state agency non-examining doctors. Therefore, "[b]ecause the hypothetical

question included those limitations which the ALJ found credible and excluded only those limitations which were discredited for a legally sufficient reason, there is substantial evidence to support the Commissioner's determination that [Plaintiff] can perform a significant number of jobs in the national economy." <u>Gant</u>, 372 F. App'x at 586 (citation omitted).

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 20) will be denied and the decision of the Social Security Administration will be affirmed.  An appropriate Order shall be entered.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE